## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

JIMMIE DALE MILLER,

     Plaintiff,

         v.

WEXFORD HEALTH SOURCE, INC.[1]
*et al.*,

     Defendants.

No. 17-cv-05609

Judge John F. Kness

## MEMORANDUM OPINION AND ORDER

Plaintiff brings this action under 42 U.S.C. § 1983, alleging that Defendants violated his Eighth Amendment right to be free from cruel and unusual punishment when they were deliberately indifferent in the medical care they provided him during his incarceration. (Dkt. 70.) Defendants now move for summary judgment. (Dkt. 83; Dkt. 86.) For the reasons that follow, Defendants' motions for summary judgment are granted.

## I.    BACKGROUND

### A.    The Parties and Antecedent Context

Plaintiff was an inmate within the Illinois Department of Corrections (IDOC) when the events giving rise to this action occurred. (Dkt. 102 ¶ 6; Dkt. 103 ¶ 1.) IDOC

---

[1] Former Governor Rauner was terminated as a Defendant in this case. (*See* Dkt. 26.) The Clerk is directed to update the case caption accordingly.

has retained Wexford Health Sources, Inc. as a third-party contractor to provide medical and health services to inmates held in Illinois correctional facilities. (Dkt. 103 ¶ 4.) Dr. Evaristo Aguinaldo is a medical doctor employed by Wexford since at least December 2005. (Dkt. 102 ¶ 7; Dkt. 103 ¶ 2; Dkt. 110 ¶ 72.) Dr. Aguinaldo's responsibilities do not include supervising nursing staff to determine whether nurses properly refer inmates to see doctors. (Dkt. 102 ¶ 66.) Lawanda Frazier and Miriam Abraham are registered nurses who worked for IDOC when the events giving rise to this action occurred; they were employed by the State of Illinois, not Wexford. (*Id.* ¶¶ 9–10; Dkt. 103 ¶¶ 6, 8.)

Even before June 2016, when the events giving rise to this action began, Plaintiff had been incarcerated within IDOC for over seven years as the result of his conviction for a criminal offense. (Dkt. 102 ¶¶ 16–17; Dkt. 103 ¶ 14.) Plaintiff was released from that incarceration on August 25, 2014 and remained out of IDOC custody until June 13, 2016. (Dkt. 102 ¶ 17.) During this period out of custody, Plaintiff had access to healthcare, including the Core Center at Stroger Hospital and the Heartland Alliance. (*Id.* ¶ 19.) Plaintiff also had private health insurance through Blue Cross Blue Shield during a portion of this period. (*Id.*) In May 2016, Plaintiff was placed on house arrest after being arrested for burglary in Cook County and remained under house arrest until June 13, 2016. (*Id.* ¶ 18.) While on house arrest, Plaintiff had a physical altercation with his neighbor. During this fracas, Plaintiff injured his wrists. (*Id.* ¶ 41.) Plaintiff did not seek medical attention (and the

inevitable scrutiny surrounding the incident) for his wrist injuries, however, because fighting his neighbor violated the conditions of his house arrest. (*Id*; Dkt. 103 ¶ 16.)

Plaintiff was first diagnosed with diabetes in February 2013. (Dkt. 102 ¶ 22.) In August or September 2014, he tested positive for Hepatitis C. (*Id.* ¶ 23.) During his period out of custody, Plaintiff could not obtain treatment for Hepatitis C because he would not quit drinking alcohol. (*Id.* ¶ 25.) Heartland Alliance offered to send Plaintiff to an inpatient treatment program to address his alcohol dependency, but Plaintiff declined that opportunity. (*Id.*) While not in custody, Plaintiff had access to vision care, dental treatment, and mental health treatment. (*Id.* ¶¶ 26–28.) Plaintiff does not have any formalized medical training other than having taken some Certified Nursing Assistant (CNA) classes in the past. (Dkt. 103 ¶ 12.)

When Plaintiff entered IDOC custody on June 16, 2016, he was first sent to the Northern Reception Center (NRC) of Stateville Correctional Center (SCC). (Dkt. 102 ¶ 30; Dkt. 103 ¶ 15.) The NRC functions as a short-term classification facility for male inmates entering IDOC custody; its purpose does not extend to housing inmates permanently for long-term sentences. (Dkt. 102 ¶ 30–31.) If an inmate at the NRC wants to see a doctor, dentist, or eye doctor, he must fill out a sick call request. (*Id.* ¶ 32.) The standard procedure for scheduling sick calls at the NRC consists of the inmate completing a sick call request; an IDOC officer takes the request and places it in a receiving box; and a medical technician takes the collected requests to the healthcare unit to make a list of patients for the medical providers to

see the next day.[2] (*Id*.) On June 16, 2016 and in following months, Dr. Aguinaldo, Nurse Frazier, and Nurse Abraham all worked at the NRC. (Dkt. 102 ¶¶ 7–8; Dkt. 103 ¶¶ 2, 4, 6, 8.)

## B. Plaintiff's Appointment with Dr. Aguinaldo on June 16, 2016

On June 16, 2016, Plaintiff entered the NRC. (Dkt. 102 ¶ 34.) A nurse examined Plaintiff and referred him to Dr. Aguinaldo. (*Id*.) When Plaintiff met with Dr. Aguinaldo, the parties agree that Plaintiff said he was allergic to onions and had a history of Hepatitis C, alcohol abuse, Type 2 diabetes, high cholesterol, hypertension, gastroesophageal reflux disease (GERD), a psychiatric disorder, and seborrheic dermatitis. (*Id*. ¶ 35.)

In response, Dr. Aguinaldo conducted a complete physical examination of Plaintiff. (*Id*. ¶ 36.) Dr. Aguinaldo verified some of Plaintiff's self-reported maladies by comparing Plaintiff's representations with a medication list from Plaintiff's last period in custody. (*Id*. ¶ 37.) This list showed that Plaintiff was already taking medication for hypertension, high cholesterol, and GERD, as well as Risperidone for his mental health issues. (*Id*.) Given Plaintiff's history of Type 2 diabetes, Dr. Aguinaldo directed that Plaintiff's blood sugar be checked daily for ten days. (*Id*. ¶ 38.) Dr. Aguinaldo also ordered that a medical provider should treat Plaintiff if his blood sugar rose above 150 mg/dL. (*Id*.) To address Plaintiff's scalp problem, Dr.

---

[2] In his Response to the Wexford Defendants' Statement of Material Facts, Plaintiff admits that this procedure occurs "in many but not all circumstances." (Dkt. 102 ¶ 32.) Plaintiff does not deny, however, that this procedure was followed as to him.

Aguinaldo prescribed a medicated shampoo. (Dkt. 110 ¶ 74.) Dr. Aguinaldo also prescribed medication to address Plaintiff's alcohol withdrawal symptoms. (*Id.*)

There are disagreements, however, over the extent to which Dr. Aguinaldo dealt with Plaintiff's Hepatitis C status. Plaintiff admits that inmates were referred to the NRC's Hepatitis C clinic when appropriate to do so. (Dkt. 102 ¶ 61.) Plaintiff also admits that the process for evaluating whether patients should receive Hepatitis C antiretroviral medication is long process and considers many factors. (*Id.*) But the parties differ in their characterization of how Dr. Aguinaldo addressed Plaintiff's Hepatitis C status. Plaintiff contends that Dr. Aguinaldo entirely failed to address the issue. (Dkt. 110 ¶¶ 78, 80.)

Defendants respond that Dr. Aguinaldo chose to refrain from prescribing Plaintiff antiretroviral medication to treat his Hepatitis C because doing so would have been medically inappropriate, for two reasons. First, Dr. Arthur Funk, a representative of Wexford, testified in his deposition that patients with a substance abuse problem—such as Plaintiff's alcohol abuse from which he was experiencing withdrawal on June 16, 2016—must be substance-free for six months before starting antiretroviral treatment. (Dkt. 102 ¶ 61 (citing Dkt. 87-3 at 37:8–13, 69:8–12).) Second, Dr. Funk testified that it is imperative for individuals receiving antiretroviral medication not to miss even a single dose. (Dkt. 110 ¶ 78 (citing Dkt. 87-3 at 38:7–9).) Accordingly, doctors working at the NRC know that the NRC, as a transitional facility, is an inappropriate place to begin an antiretroviral treatment because the risk of missing doses due to patients transitioning in and out of the NRC

5

is too high. (Dkt. 102 ¶ 61; Dkt. 110 ¶ 78). There is only one exception to this rule: if the patient already had begun the treatment before arriving at the NRC, the treatment would continue while residing at the NRC. (*Id.*) Given these factors—Plaintiff's recent alcohol abuse, Plaintiff not having started a medicinal regiment, and the transitional status of the NRC—Dr. Aguinaldo decided not to prescribe Plaintiff antiretroviral medication at the June 16, 2016 appointment. (*Id.*)

Also at issue is whether Plaintiff told Dr. Aguinaldo about any other maladies at his June 16, 2016 appointment. Plaintiff represents that he also told Dr. Aguinaldo that he suffered from wrist injuries, dental problems, eye and vision problems, and kidney pain. (Dkt. 102 ¶ 68 (citing Dkt. 70 ¶¶ 16, 18); *Id.* ¶ 73 (citing Dkt. 70 ¶¶ 16, 18; Dkt. 87-1 at 127:4–19).) Defendants deny that Plaintiff presented these other maladies and object that Plaintiff cites to his own complaint in support of his representations. (Dkt. 110 ¶¶ 68, 73.) These alleged maladies are addressed in turn.

First, Plaintiff admits that he did not show any outward signs of his wrist injuries. (Dkt. 102 ¶ 42.) Plaintiff also admits that nothing in his intake records shows that he self-reported wrist pain to Dr. Aguinaldo or other medical staff. (*Id.*) Plaintiff concedes that his wrists healed on their own and that he has no lasting medical problems from his wrist injuries. (*Id.* ¶ 43.) Instead, the parties dispute only whether Plaintiff told Dr. Aguinaldo about his wrist injuries: Plaintiff contends that he told Dr. Aguinaldo about his wrists, while Defendants maintain Plaintiff did not. (*Id.* ¶ 42; Dkt. 110 ¶ 75.)

Second, Plaintiff contends that he told Dr. Aguinaldo about his dental problems. (Dkt. 110 ¶¶ 68, 73.) Plaintiff had four teeth pulled at some point after entering IDOC custody. (Dkt. 102 ¶ 45.) But Plaintiff admits that no medical professional, including Dr. Aguinaldo, told him that not seeing a dentist between June 16, 2016 and September 1, 2016 ever caused him harm. (*Id.*) Plaintiff also admits that the alleged bone loss he suffered in his mouth could have occurred between August 24, 2015 and June 16, 2016 when Plaintiff was out of custody and chose not to seek any dental treatment. (*Id.*) Plaintiff further admits that he does not believe that the alleged bone loss occurred during his custody at the NRC. (*Id.*)

Third, Plaintiff admits that he did not have any emergency related to his eyeglasses or vision that required immediate treatment upon arrival into IDOC custody. (Dkt. 102 ¶ 44.) Plaintiff nonetheless contends that Dr. Aguinaldo did not record on his examination report Plaintiff's problem with his eyeglasses. (Dkt. 110 ¶ 76.) Plaintiff concedes that the lenses themselves were not broken but alleges that he could not wear the lenses in broken frames. (*Id.*) Defendants respond that Plaintiff's citation establishes that Plaintiff could wear his eyeglasses but simply wanted them repaired. (*Id.* (citing Dkt. 87-1 at 82:6–83:5).)

Fourth, Plaintiff admits that the only mention of kidney pain in his NRC medical records is from October 8, 2016. (Dkt. 102 ¶ 56.) Plaintiff contends that Dr. Aguinaldo did not record on his examination report Plaintiff's problem with right-side kidney pain when they met on June 16, 2016. (Dkt. 110 ¶ 77 (citing Dkt. 87-1 at

122:3–6; Dkt. 87-2 at 96:21–97:16).) Defendants respond that Plaintiff did not report any kidney pain when meeting with Dr. Aguinaldo on June 16, 2016.

### C. Plaintiff's Appointment with Defendant Frazier

Plaintiff completed a sick call request sometime in June 2016, presumably after his June 16, 2016 appointment with Dr. Aguinaldo. (Dkt. 102 ¶ 46.) Around two weeks later, on June 28, 2016,[3] Plaintiff had an appointment with Nurse Lawanda Frazier. (*Id.*; Dkt. 103 ¶ 17.) The parties do not dispute that Plaintiff filled out a "Medical Services Refusal" form refusing to be treated by Nurse Frazier. (Dkt. 103 ¶ 18; Dkt. 85-6.) But the parties disagree on *why* Plaintiff completed the refusal form.

Plaintiff contends that Nurse Frazier could not find his medical records for the appointment, which Nurse Frazier disputes. (Dkt. 108 ¶ 36.) Nurse Frazier represented to Plaintiff that, without his medical records, she could not provide a full examination or prescribe medication. (Dkt. 103 ¶ 19.) At most, Nurse Frazier could only check Plaintiff's vitals and provide over-the-counter medication. (*Id.*) If Plaintiff's condition had been an emergency, however, he would have received care even without the medical records. (*Id.* ¶ 21.) But Plaintiff maintains that Nurse Frazier encouraged Plaintiff to sign a refusal form so that he would not be charged a

---

[3] The parties' filings are inconsistent as to the date of Plaintiff's appointment with Nurse Frazier. The Wexford Defendants state that Defendant Frazier saw Plaintiff on June 27, 2016. (Dkt. 87 ¶ 46.) The IDOC Nurse Defendants, however, state that Defendant Frazier saw Plaintiff on June 28, 2016. (Dkt. 85 ¶ 17.) But Plaintiff admits to both paragraphs in his Responses to Defendants' Statements of Material Facts. (Dkt. 102 ¶ 46; Dkt. 103 ¶ 17.) Yet the Refusal of Services form Plaintiff signed—memorializing his decision to refuse treatment by Nurse Frazier—is dated June 28, 2016. (Dkt. 85-6.) Accordingly, the Court finds that Plaintiff's appointment with Nurse Frazier took place on June 28, 2016.

$5 fee for the appointment. (Dkt. 108 ¶ 38.) Plaintiff thus asserts that he signed the refusal form according to Nurse Frazier's "advice." (*Id.* ¶ 40.) Nurse Frazier does not dispute that Plaintiff signed the form; she only disputes Plaintiff's given reason for why he signed the form. (*Id.* ¶¶ 36–41.)

### D.     Plaintiff's Two July 2016 Grievances and August 2016 Letter

Plaintiff admits that, between June 28, 2016, when he refused medical treatment at his appointment with Nurse Frazier, and August 16, 2016, Plaintiff did not seek medical care through the normal sick call request system. (Dkt. 103 ¶ 22.) On July 1, 2016, however, Plaintiff filed a grievance with SCC, listing his medical ailments and requesting immediate treatment. (Dkt. 70 at 13–15.) Plaintiff construes this grievance as "seeking the medical attention he was denied," while Defendants deny this characterization of the events of June 28, 2016. (Dkt. 108 ¶ 43.) On September 26, 2016, after Plaintiff was transferred from the NRC to Pinckneyville Correctional Center (PCC), Plaintiff received the following response to his grievance: "You have been transferred to Pinckneyville CC on 09-01-16. You should be able to receive proper medical treatment at this facility." (Dkt. 70 at 13.)

On July 26, 2016, Plaintiff filed a second grievance with SCC, citing the same array of medical issues and seeking treatment. (*Id.* at 17–18.) On September 26, 2016, Plaintiff received a response from the Counselor stating that this second grievance was merely a duplicate of the first filed on July 1, 2016. (*Id.* at 17.)

Plaintiff also alleges that he wrote a letter to Wexford dated August 13, 2016, in which he listed his medical ailments, described his appointment with Dr.

9

Aguinaldo, and requested further medical attention. (Dkt. 102 ¶ 53; Dkt. 70 at 20–22.) Plaintiff and Defendants all acknowledge that Wexford never responded to this letter. (Dkt. 102 ¶ 53.) Plaintiff admits that he does not know the address to which he sent the letter, nor does he possess any proof that Wexford ever received it. (*Id.*)

On April 3, 2017, in response to his two July 2016 grievances, Plaintiff received a letter from the Administrative Review Board stating that it was the "opinion of this office that the grievances, at the time of filing, were premature. Therefore, no further action will be taken." (Dkt. 70 at 34.)

### E. Defendant Abraham's Interactions with Plaintiff

The parties do not dispute that Plaintiff saw Nurse Abraham for treatment on October 5, 2016. (Dkt. 108 ¶ 47.) What remains disputed, however, is whether they had an interaction two months earlier on August 16, 2016. Plaintiff contends that he gave Nurse Abraham an emergency sick call request that day. (Dkt. 103 ¶¶ 44–45.) Defendants dispute that Plaintiff gave Nurse Abraham this request form because the form is written entirely in Plaintiff's handwriting and is not marked as received by anyone from Wexford or IDOC.[4] (Dkt. 108 ¶¶ 44–45.) An examination of the request form itself confirms that no notation from Wexford or IDOC is present. (Dkt. 85-7.) Defendants contend that, if Plaintiff had given Nurse Abraham the request form, she would have arranged for him to be placed on the sick call for the next day, which Plaintiff denies. (Dkt. 103 ¶ 24.) Plaintiff admits, however, that Nurse Abraham has

---

[4] Plaintiff admits that he does not know if Dr. Aguinaldo or anyone from Wexford ever saw the medical request he allegedly gave IDOC Nurse Abraham on August 16, 2016. (Dkt. 102 ¶ 47.)

never participated in creating the sick call list. (*Id.* ¶ 26.) Plaintiff also admits that he did not fill out any other medical request forms before his transfer from SCC to PCC on September 1, 2016. (Dkt. 102 ¶ 48.) Plaintiff was transferred back to the NRC on October 5, 2016. (Dkt. 108 ¶ 47.)

On October 8, 2016, Plaintiff was seen by Nurse Abraham, who recorded a patient history from Plaintiff. (Dkt. 103 ¶ 28.) Plaintiff reported that his Hepatitis C and kidney area soreness had persisted. (Dkt. 108 ¶ 47.) Plaintiff also told her that he had diabetes. (Dkt. 103 ¶ 29.) Nurse Abraham determined that Plaintiff's feet were "not dry" (Plaintiff had complained that the skin on his feet was dry, apparently due to diabetes) and recommended that he purchase lotion from the commissary to improve the condition of his feet. (*Id.* ¶ 30.) She also ordered a reevaluation of Plaintiff's diabetes by a doctor to take place the next day. (*Id.* ¶ 32.) As for Nurse Abraham's recommendation that Plaintiff take Tylenol or Motrin to combat his chronic kidney pain, the record becomes less clear. Plaintiff admits that Nurse Abraham recommended that he take one of these over-the-counter pain relievers. (*Id.* ¶ 31.) Plaintiff also admits that he refused to take either pain reliever. (*Id.*) Plaintiff contends that he told Nurse Abraham that he was refusing to take the pain relievers because those medications might adversely affect his Hepatitis C condition, which Defendants dispute. (Dkt. 108 ¶ 49.) Nurse Abraham's progress note does not reflect Plaintiff's alleged reason for refusing the pain killers. (Dkt. 85-5.) In any event, the parties do not dispute that Nurse Abraham told Plaintiff that he was refusing treatment, that Plaintiff refused to complete the form, and that Nurse Abraham

unilaterally submitted a refusal of service form into Plaintiff's medical records. (Dkt. 108 ¶ 50.)

After the October 8, 2016 appointment with Nurse Abraham ended, Plaintiff filed a third grievance with SCC that same day, elaborating on the same array of medical issues and requesting to see a doctor as soon as possible. (Dkt. 70 at 24–25.) Three days later, on October 11, 2016, Plaintiff received the following response from the Counselor: "A copy of the grievance has been forwarded to the office for review and response, and the original grievance has been forwarded to the grievance office. You will receive a final response from the grievance office when the health care unit responds." (*Id.* at 24.)

Defendants argue that all three grievances filed by Plaintiff are immaterial to whether Defendants were deliberately indifferent to Plaintiff's allegedly serious medical conditions. (Dkt. 108 ¶¶ 43, 51–52.) Defendants also dispute that Plaintiff was attempting to seek treatment by filing grievances because inmates file sick call requests to be seen by medical staff, as Plaintiff himself had done. (*Id.* ¶¶ 51–52.)

## F.  Defendant Wexford's Role at the NRC and Dr. Aguinaldo's Involvement After June 16, 2016

IDOC has retained Wexford Health Sources, Inc. as a third-party contractor to provide medical and health services to inmates held in Illinois correctional facilities. (Dkt. 103 ¶ 4.) Wexford was not the sole provider of medical services at the NRC in 2016. (Dkt. 102 ¶ 60.) In addition to Wexford, the State of Illinois employed nurses such as Defendants Frazier and Abraham, as well as dentists, psychologists, and the Healthcare Unit Administrator. (*Id.*) Wexford was responsible for providing

12

supervision for the contractual services it provided, and the State of Illinois was responsible for providing supervision for its contractual services. (*Id.*) IDOC, not Wexford, maintains inmate medical records. (*Id.* ¶ 65.) Plaintiff admits that there is no Wexford or IDOC policy restricting inmates to addressing only one medical complaint per sick call with a health provider at the NRC. (*Id.* ¶ 63.)

Plaintiff admits that Dr. Aguinaldo was not responsible for his healthcare during Plaintiff's incarceration at PCC. (*Id.* ¶ 57.) Plaintiff also admits that Dr. Aguinaldo would not have been responsible for Plaintiff's healthcare during his two-week incarceration at the NRC in October 2016 unless Dr. Aguinaldo were the NRC's presiding doctor at the time. (*Id.*) Plaintiff admits as well that, during his October 2016 stay at the NRC, Plaintiff did not see Dr. Aguinaldo, nor did Plaintiff ask to see him. (*Id.*)

### G. Procedural history

Plaintiff began this case with a *pro se* complaint against Defendants under Section 1983.[5] (Dkt. 1.) After a receiving a series of appointed counsel and filing several amended complaints, Plaintiff filed his Fourth Amended Complaint, which remains the operative complaint. (Dkt. 70.) Defendants now move for summary judgment. (Dkt. 83; Dkt. 86.)

## II. LEGAL STANDARD

Summary judgment is warranted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show

---

[5] The case was originally assigned to Judge John Blakey but was later transferred to the calendar of the undersigned.

that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Jewett v. Anders*, 521 F.3d 818, 821 (7th Cir. 2008) (quoting *Magin v. Monsanto Co.*, 420 F.3d 679, 686 (7th Cir. 2005)); *see also* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322−23 (1986). Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. As the " 'put up or shut up' moment in a lawsuit, summary judgment requires a non-moving party to respond to the moving party's properly supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (quotations omitted). All facts, and any inferences to be drawn from them, are viewed in the light most favorable to Plaintiff as the nonmoving party. *See Scott v. Harris*, 550 U.S. 372, 378 (2007).

## III. DISCUSSION

### A. Liability Under Section 1983

Section 1 of the Civil Rights Act of 1871, now codified at 42 U.S.C. § 1983, "created a species of federal tort liability for individuals to sue state and local officers for deprivations of constitutional rights." *Thompson v. Clark*, 142 S. Ct. 1332, 1336–37 (2022). To state a claim under Section 1983, a plaintiff "must allege two elements: (1) the conduct complained of was committed by a person acting under color of state

law; and (2) the activity deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Case v. Milewski*, 327 F.3d 564, 566 (7th Cir. 2003) (citing *West v. Atkins*, 487 U.S. 42, 48 (1988)).

Acting "under color of state law" means an official exercises power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *West*, 487 U.S. at 49. Whether an official acts "under color of state law 'turn[s] largely on the nature of the specific acts' the official performed, 'rather than on merely whether he was actively assigned at the moment' to the performance of his official duties." *DiDonato v. Panatera*, 24 F.4th 1156, 1160 (7th Cir. 2022) (quoting *Pickrel v. City of Springfield*, 45 F.3d 1115, 1118 (7th Cir. 1995)).

Liability under Section 1983 requires "some personal involvement in the alleged constitutional deprivation." *Williams v. Shah*, 927 F.3d 476, 482 (7th Cir. 2019) (citing *Consolino v. Towne*, 872 F.3d 825, 832 (7th Cir. 2017)). The individual defendant must have "caused or participated in a constitutional deprivation" to be liable under Section 1983. *Pepper v. Vill. of Oak Park*, 430 F.3d 805, 810 (7th Cir. 2005) (quoting *Sheik–Abdi v. McClellan*, 37 F.3d 1240, 1248 (7th Cir. 1994)).

But Section 1983 does not allow actions against individuals "merely for their supervisory role of others." *Doe v. Purdue Univ.*, 928 F.3d 652, 664 (7th Cir. 2019) (quoting *Zimmerman v. Tribble*, 226 F.3d 568, 574 (7th Cir. 2000)). Rather, to be liable, a supervisor must "know about the conduct and facilitate it, approve it, condone it, or turn a blind eye." *Id.* (quoting *Zentmyer v. Kendall Cnty.*, 220 F.3d 805, 812 (7th Cir. 2000)). It is also "well established that there is no *respondeat superior*

liability" under Section 1983. *Gayton v. McCoy*, 593 F.3d 610, 622 (7th Cir. 2010) (citing *Horwitz v. Bd. of Educ. of Avoca Sch. Dist. No. 37*, 260 F.3d 602, 619–20 (7th Cir. 2001)); *see also Gray v. Taylor*, 714 F. Supp. 2d 903, 911 (N.D. Ill. 2010) ("The doctrine of *respondeat superior* (blanket supervisory liability) does not apply to actions filed under 42 U.S.C. § 1983.") (citing *Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001)). A "private corporation is not vicariously liable" under Section 1983 "for its employees' deprivations of others' civil rights." *Gayton*, 593 F.3d at 622 (quoting *Iskander v. Vill. of Forest Park*, 690 F.2d 126, 128 (7th Cir.1982)).

## B. Eighth Amendment Deliberate Indifference Standard

Through its Eighth Amendment, the United States Constitution prohibits "cruel and unusual punishments." U.S. Const. amend. VIII. This clause of the Eighth Amendment has been "made applicable to state officials and employees by interpretation of the Fourteenth Amendment's due process clause." *Dobbey v. Mitchell-Lawshea*, 806 F.3d 938, 940 (7th Cir. 2015) (citing *Estelle v. Gamble*, 429 U.S. 97, 101 (1976)). Although prisoners are not entitled under the Eighth Amendment to "the best care possible" nor even to "demand specific care," *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997), the Eighth Amendment safeguards prisoners "against a lack of medical care that 'may result in pain and suffering which no one suggests would serve any penological purpose.'" *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009) (quoting *Estelle*, 429 U.S. at 103). Accordingly, to state an Eighth Amendment claim based on deficient medical care, a plaintiff must allege an injury under a legal standard bearing both an objective and

16

subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Specifically, a plaintiff must show both "an objectively serious medical condition and an official's deliberate indifference to that condition." *Perez v. Fenoglio*, 792 F.3d 768, 776 (7th Cir. 2015) (citing *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011)).

First, the plaintiff's medical condition must be, objectively, "sufficiently serious." *Farmer*, 511 U.S. at 834 (citing *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). An objectively serious medical condition is one that "has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008) (quoting *Greeno v. Daley*, 414 F.3d 645, 652 (7th Cir. 2005)).

Second, whether an official acted with deliberate indifference towards the plaintiff's medical condition is to ask whether the official acted with a "sufficiently culpable state of mind." *Wilson*, 501 U.S. at 297. This subjective analysis has two components: to constitute deliberate indifference, the official "realizes that a substantial risk of serious harm to a prisoner exists, but then disregards that risk." *Perez*, 792 F.3d at 776 (citing *Farmer*, 511 U.S. at 837); *see also Collins v. Seeman*, 462 F.3d 757, 761 (7th Cir. 2006) (defendant must have subjective knowledge of risk to inmate's health and must also disregard that risk). An official must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and "must also draw the inference." *Greeno*, 414 F.3d at 653 (citing *Farmer*, 511 U.S. at 837).

Accordingly, deliberate indifference "requires a showing of more than mere or gross negligence, but less than purposeful infliction of harm." *Knight v. Wiseman*, 590 F.3d 458, 463 (7th Cir. 2009); *see also Arnett*, 658 F.3d at 751 (deliberate indifference is "more than negligence and approaches intentional wrongdoing"); *Perez*, 792 F.3d at 777 (deliberate indifference "reflects a mental state somewhere between the culpability poles of negligence and purpose, and is thus properly equated with reckless disregard"). A plaintiff must show that the defendants' responses to his plight were "so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded his needs." *Hayes*, 546 F.3d at 524 (citing *Greeno*, 414 F.3d at 653).

Applying this standard to medical professionals working with prisoners, the Seventh Circuit has explained that a medical professional is "entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances." *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) (quoting *Sain v. Wood*, 512 F.3d 886, 894–95 (7th Cir. 2008)). A plaintiff arguing for deliberate indifference is thus required to reach a high bar; he must show that the medical professional's actions constitute "a substantial departure from accepted professional judgment, practice, or standards." *Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 616 (7th Cir. 2022) (quoting *Gayton*, 593 F.3d at 623); *see also Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006) (medical professional commits deliberate indifference only if plaintiff demonstrates "complete abandonment of medical judgment"). In addition, the Eighth Amendment "does not codify common law torts."

*Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir.2008). Accordingly, neither medical malpractice nor a mere disagreement with a doctor's medical judgment amounts to deliberate indifference. *See Estelle*, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261 (7th Cir. 1996) (medical providers' differing opinions as to best treatment for prisoner do not amount to deliberate indifference).

### C.   All Defendants Are Entitled to Summary Judgment

The parties do not dispute that Defendants were acting "under color of state law" during their interactions with Plaintiff for purposes of Plaintiff's Section 1983 claim. *West*, 487 U.S. at 49; *DiDonato*, 24 F.4th at 1160. Accordingly, the parties disagree only concerning whether Defendants deprived Plaintiff of his Eighth Amendment right to be free from cruel and unusual punishment. *Case*, 327 F.3d at 566.

As explained below, because no reasonable jury could find that any Defendant interacting with Plaintiff acted with a "sufficiently culpable state of mind" to constitute deliberate indifference, *Wilson*, 501 U.S. at 297, no Defendant violated Plaintiff's Eighth Amendment right to be free from cruel and unusual punishment. *Farmer*, 511 U.S. at 837; *Perez*, 792 F.3d at 776. As a result, Plaintiff's Section 1983 claim fails, and every Defendant is entitled to summary judgment. Fed. R. Civ. P. 56(c); *Jewett*, 521 F.3d at 821.

1.      **Dr. Evaristo Aguinaldo**

Plaintiff admits that his only interaction with Dr. Aguinaldo occurred on June 16, 2016. (Dkt. 102 ¶¶ 34, 57.) Plaintiff also admits that Dr. Aguinaldo conducted a complete physical examination of him that day. (*Id.* ¶ 36.) The parties disagree, however, about the scope of maladies presented to and addressed by Dr. Aguinaldo during the appointment. These maladies are addressed in two groups: those on which the parties agree, and others on which they disagree.

a.      **Undisputed Maladies**

The parties agree that, during Plaintiff's appointment with Dr. Aguinaldo, Plaintiff told him that he was allergic to onions and had a history of Hepatitis C, alcohol abuse, Type 2 diabetes, high cholesterol, hypertension, gastroesophageal reflux disease (GERD), a psychiatric disorder, and seborrheic dermatitis. (*Id.* ¶ 35.) Dr. Aguinaldo verified some of Plaintiff's self-reported maladies by comparing Plaintiff's representations with a medication list from Plaintiff's last period in custody. (*Id.* ¶ 37.) That list showed Plaintiff was already taking medication for hypertension, high cholesterol, and GERD as well as Risperidone for his mental health issues. (*Id.*) Because Plaintiff had a history of Type 2 diabetes, Dr. Aguinaldo directed that Plaintiff's blood sugar be checked daily for ten days. (*Id.* ¶ 38.) Dr. Aguinaldo also ordered that a medical provider should treat Plaintiff if his blood sugar rose above 150 mg/dL. (*Id.*) To address Plaintiff's scalp problem, Dr. Aguinaldo prescribed a medicated shampoo. (Dkt. 110 ¶ 74.) Dr. Aguinaldo also prescribed medication to address Plaintiff's alcohol withdrawal symptoms. (*Id.*)

All of the maladies above that were presented to Dr. Aguinaldo satisfy the objective criterion for showing deliberate indifference because they are all "sufficiently serious." *Farmer*, 511 U.S. at 834 (citing *Wilson*, 501 U.S. at 298); *Hayes v. Snyder*, 546 F.3d at 522. But because there is insufficient evidence Dr. Aguinaldo acted with a "sufficiently culpable state of mind," Plaintiff fails to show a triable issue of deliberate indifference. *Wilson*, 501 U.S. at 297. On the contrary, Dr. Aguinaldo analyzed Plaintiff's many medical conditions and treated them appropriately. For example, Plaintiff's medication history showed that he was already taking medication for hypertension, high cholesterol, and GERD as well as Risperidone for his mental health issues. (Dkt. 102 ¶ 37.) Dr. Aguinaldo acted prudently to refrain from prescribing medication for these conditions on top of Plaintiff's existing regiment.

Dr. Aguinaldo also addressed Plaintiff's other health conditions. To monitor Plaintiff's Type 2 diabetes, Dr. Aguinaldo directed that Plaintiff's blood sugar be checked daily for ten days and ordered that a medical provider should treat Plaintiff if his blood sugar rose above 150 mg/dL.. (*Id.* ¶ 38.) To address Plaintiff's scalp problem, Dr. Aguinaldo prescribed a medicated shampoo. (Dkt. 110 ¶ 74.) Dr. Aguinaldo also prescribed medication to address Plaintiff's alcohol withdrawal symptoms. (*Id.*)

For all these maladies, Dr. Aguinaldo's decisions were not even negligent, let alone indicative of deliberate indifference. *See Knight*, 590 F.3d at 463 (deliberate indifference "requires a showing of more than mere or gross negligence"). Rather, Dr. Aguinaldo acted appropriately, easily reaching the low bar entitling him to deference

in those treatment decisions. *Elyea*, 631 F.3d at 857. Dr. Aguinaldo's responses were certainly not "so plainly inappropriate as to permit the inference" that he "recklessly disregarded" Plaintiff's medical needs. *Hayes*, 546 F.3d at 524 (citing *Greeno*, 414 F.3d at 653). Accordingly, Plaintiff has failed to make a triable showing that Dr. Aguinaldo acted with deliberate indifference towards Plaintiff.

### b.  Disputed Maladies

Several facets of Plaintiff's June 16, 2016 appointment are in dispute. The parties first disagree over the extent to which Dr. Aguinaldo dealt with Plaintiff's Hepatitis C status. (Dkt. 102 ¶ 61; Dkt. 110 ¶¶ 78, 80.) They also dispute whether Plaintiff represented to Dr. Aguinaldo that he also suffered from wrist injuries, dental problems, eye and vision problems, and kidney pain. (Dkt. 110 ¶¶ 68, 73.) Each of these alleged conditions is addressed in turn.

### i.  Hepatitis C

There is no dispute that Plaintiff told Dr. Aguinaldo he was positive for Hepatitis C. (Dkt. 102 ¶ 35.) Plaintiff contends, however, that Dr. Aguinaldo failed entirely to address the issue. (Dkt. 110 ¶¶ 78, 80.) Defendants respond that Dr. Aguinaldo refrained from prescribing Plaintiff antiretroviral medication to treat his Hepatitis C because doing so would have been medically inappropriate, for two reasons. First, Dr. Arthur Funk, a representative of Wexford, testified in his deposition that patients with a substance abuse problem—such as Plaintiff's alcohol abuse from which he was experiencing withdrawal on June 16, 2016—must be substance-free for six months before starting antiretroviral treatment. (Dkt. 102 ¶ 61

(citing Dkt. 87-3 at 37:8–13, 69:8–12).) Second, Dr. Funk testified that it is imperative for individuals receiving antiretroviral medication not to miss even a single dose. (Dkt. 110 ¶ 78 (citing Dkt. 87-3 at 38:7–9).) Accordingly, doctors working at the NRC know that the NRC, as a transitional facility, is an inappropriate place to begin an antiretroviral treatment because the risk of missing doses due to patients transitioning in and out of the NRC is too high. (Dkt. 102 ¶ 61; Dkt. 110 ¶ 78). There is only one exception to this rule: if the patient already had begun the treatment before arriving at the NRC, the treatment would continue while residing at the NRC. (*Id.*) Given these factors—Plaintiff's recent alcohol abuse, Plaintiff not having started a medicinal regiment, and the transitional status of the NRC—Dr. Aguinaldo determined not to provide Plaintiff antiretroviral medication at the June 16, 2016 appointment. (*Id.*)

Because Dr. Funk testified as to what the accepted professional standard is for treating Hepatitis C in individuals who have recently abused alcohol, and Plaintiff has not provided any rebuttal testimony, the record establishes that patients with a substance-abuse problem must be substance-free for six months before starting antiretroviral treatment. (Dkt. 102 ¶ 61.) Dr. Aguinaldo prescribed medication to combat Plaintiff's alcohol withdrawal symptoms at the June 16, 2016 appointment (Dkt. 110 ¶ 74), so Plaintiff was not substance-free for six months before June 16, 2016. Plaintiff was therefore not eligible to begin antiretroviral treatment when he was seen by Dr. Aguinaldo, and Dr. Aguinaldo acted in accordance with the accepted professional standard. Plaintiff has not shown that Dr. Aguinaldo's actions

constituted "a substantial departure from accepted professional judgment, practice, or standards." *Stockton*, 44 F.4th at 616 (quoting *Gayton*, 593 F.3d at 623). Dr. Aguinaldo's treatment decision to refrain from prescribing medication to combat Plaintiff's Hepatitis C is entitled to deference. *Elyea*, 631 F.3d at 857. This analysis in favor of Dr. Aguinaldo is strengthened by the fact that the NRC, as a transitional facility, is an inappropriate place to begin an antiretroviral treatment because the risk of missing doses due to patients transitioning in and out of the NRC is too high. (Dkt. 102 ¶ 61; Dkt. 110 ¶ 78). This consideration constitutes an independent reason for Dr. Aguinaldo to have refrained from starting Plaintiff on antiretroviral treatment.

In sum, Dr. Aguinaldo's response to Plaintiff's Hepatitis C status, given his recent alcohol abuse and the transitionary status of the NRC, was certainly not "so plainly inappropriate as to permit the inference" that he "recklessly disregarded" Plaintiff's medical needs. *Hayes*, 546 F.3d at 524 (citing *Greeno*, 414 F.3d at 653). Accordingly, Dr. Aguinaldo did not act with deliberate indifference towards Plaintiff regarding his Hepatitis C status.

### ii.     Wrist Injuries

In May or June 2016, while he was not in custody, Plaintiff had a physical altercation with his neighbor during which Plaintiff injured his wrists. (Dkt. 102 ¶ 41.) Weeks later, at his June 16, 2016 appointment with Dr. Aguinaldo, Plaintiff admits that he did not show any outward signs of his wrist injuries. (*Id.* ¶ 42.) Plaintiff also admits that nothing in his intake records shows that he self-reported

wrist pain to Dr. Aguinaldo or other medical staff. (*Id.*) In addition, Plaintiff concedes that his wrists healed on their own and that he has no lasting medical problems from his wrist injuries. (*Id.* ¶ 43.) Instead, the parties only dispute whether Plaintiff told Dr. Aguinaldo about his wrist injuries: Plaintiff contends that he told Dr. Aguinaldo about his wrists, while Defendants maintain that Plaintiff made no mention of them. (*Id.* ¶ 42; Dkt. 110 ¶ 75.)

If Plaintiff did not tell Dr. Aguinaldo about his wrist injuries on June 16, 2016, then Dr. Aguinaldo undoubtedly did not act with deliberate indifference towards Plaintiff because, of course, physicians cannot treat a condition of which they are not aware. But even if Plaintiff told Dr. Aguinaldo about his wrist injuries—drawing all inferences in favor of Plaintiff as the nonmoving party—Dr. Aguinaldo's not treating Plaintiff's wrists does not amount to deliberate indifference. First, it is unclear whether Plaintiff's wrist injuries even amount to a "sufficiently serious" medical condition. *Farmer*, 511 U.S. at 834. Plaintiff waited weeks before seeking treatment for his allegedly injured wrists. (Dkt. 102 ¶ 41.) Plaintiff also did not show any outward signs of his wrist injuries at the time of his June 16, 2016 appointment. (Dkt. 102 ¶ 42.) Although these facts do not eliminate the possibility that Plaintiff's wrist injuries were objectively "sufficiently serious," *Farmer*, 511 U.S. at 834, they tend to cut against characterizing his injuries as "so obvious that even a lay person would perceive the need for a doctor's attention." *Hayes*, 546 F.3d at 522. Plaintiff also conceded that his wrists healed on their own and that he has no lasting medical problems from his wrist injuries. (Dkt. 102 ¶ 43.) These facts, too, cut against,

although do not definitively disprove, Plaintiff's medical condition as objectively serious enough to satisfy the first prong of the deliberate indifference analysis. *Greeno*, 414 F.3d at 652.

But even if Plaintiff's wrist injuries were objectively serious, Plaintiff has presented no evidence that Dr. Aguinaldo realized that "a substantial risk of serious harm" to Plaintiff existed but "then disregard[ed] that risk." *Perez*, 792 F.3d at 776 (citing *Farmer*, 511 U.S. at 837). Because Plaintiff did not show any outward signs of his wrist injuries, Dr. Aguinaldo was well within his professional discretion to prioritize treating Plaintiff's many other maladies. Such a decision was not "a substantial departure from accepted professional judgment, practice, or standards." *Stockton*, 44 F.4th at 616. It is thus doubtful that Dr. Aguinaldo even committed mere negligence, and deliberate indifference "requires a showing of more than mere or gross negligence." *Knight*, 590 F.3d at 463; *see also Arnett*, 658 F.3d at 751 (deliberate indifference is "more than negligence and approaches intentional wrongdoing"). Given how Dr. Aguinaldo treated Plaintiff's other maladies so readily, there is insufficient evidence that Dr. Aguinaldo exhibited "reckless disregard" toward Plaintiff's alleged wrist injuries. *Perez*, 792 F.3d at 777. Accordingly, Dr. Aguinaldo did not act with deliberate indifference towards Plaintiff.

### iii.     Dental Problems

Plaintiff contends that he told Dr. Aguinaldo about his dental problems. (Dkt. 110 ¶¶ 68, 73.) Plaintiff had four teeth pulled at some point after entering IDOC custody, presumably after his June 16, 2016 appointment with Dr. Aguinaldo.

26

(Dkt. 102 ¶ 45.) But Plaintiff admits that no medical professional, including Dr. Aguinaldo, told him that not seeing a dentist between June 16, 2016 and September 1, 2016 ever caused him harm. (*Id.*) Plaintiff also admits that the alleged bone loss he suffered in his mouth could have occurred between August 24, 2015 and June 16, 2016 when Plaintiff was out of custody and chose not to seek any dental treatment. (*Id.*) Plaintiff further admits that he does not believe that the alleged bone loss occurred during his custody at the NRC. (*Id.*)

Even if Plaintiff told Dr. Aguinaldo about his dental problems—drawing all inferences in favor of Plaintiff as the nonmoving party—Dr. Aguinaldo did not exhibit deliberate indifference towards Plaintiff when not addressing his dental problems. Dr. Aguinaldo was neither a dentist nor an oral or maxillofacial specialist. Refraining from overextending himself outside his expertise was a prudent recognition of his limitations, not a "complete abandonment of medical judgment." *Norfleet*, 439 F.3d at 396. Dr. Aguinaldo's decision not to address Plaintiff's dental problems is "entitled to deference" because the Court is unpersuaded that "no minimally competent professional would have so responded under those circumstances." *Elyea*, 631 F.3d at 857. It is again doubtful that Dr. Aguinaldo even committed mere negligence, and deliberate indifference "requires a showing of more than mere or gross negligence." *Knight*, 590 F.3d at 463; *see also Arnett*, 658 F.3d at 751 (deliberate indifference is "more than negligence and approaches intentional wrongdoing"). As with Plaintiff's wrists, Dr. Aguinaldo did not exhibit "reckless disregard." *Perez*, 792 F.3d at 777. Accordingly, Dr. Aguinaldo did not act with deliberate indifference towards Plaintiff.

### iv.        Eye and Vision Problems

Plaintiff admits that he did not have any emergency related to his eyeglasses or vision that required immediate treatment upon arrival into IDOC custody. (Dkt. 102 ¶ 44.) Plaintiff nonetheless contends that Dr. Aguinaldo did not record on his examination report Plaintiff's problem with his eyeglasses. (Dkt. 110 ¶ 76.) Plaintiff concedes that the lenses themselves were not broken but alleges that he could not wear the lenses in broken frames. (*Id.*) Defendants respond that the record establishes that Plaintiff could wear his eyeglasses but simply wanted them repaired. (*Id.* (citing Dkt. 87-1 at 82:6–83:5).)

These facts cut against construing Plaintiff's situation as "sufficiently serious" to satisfy the first prong of deliberate indifference analysis. *Farmer*, 511 U.S. at 834. But even if this situation were an objectively serious medical condition, there is no evidence that Dr. Aguinaldo "realiz[ed] a substantial risk of serious harm" to Plaintiff existed, but "then disregard[ed] that risk." *Perez*, 792 F.3d at 776 (citing *Farmer*, 511 U.S. at 837). Wearing damaged yet still functional eyeglasses did not constitute a substantial risk of serious harm. Dr. Aguinaldo's decision not to address Plaintiff's broken eyeglasses is "entitled to deference" because the Court is unpersuaded that "no minimally competent professional would have so responded under those circumstances." *Elyea*, 631 F.3d at 857. Once again, the Court is unconvinced that Dr. Aguinaldo even committed mere negligence. *See Arnett*, 658 F.3d at 751 (deliberate indifference is "more than negligence and approaches intentional wrongdoing"). Because there is insufficient evidence that Dr. Aguinaldo exhibited

"reckless disregard" toward Plaintiff's alleged problem with his eyeglasses, *Perez*, 792 F.3d at 777, Dr. Aguinaldo could not have acted with deliberate indifference.

### v.    Kidney Pain

Plaintiff admits that the only mention of kidney pain in his NRC medical records is from October 8, 2016. (Dkt. 102 ¶ 56.) Plaintiff contends, however, that Dr. Aguinaldo did not record on his examination report Plaintiff's problem with right-side kidney pain when they met on June 16, 2016. (Dkt. 110 ¶ 77 (citing Dkt. 87-1 at 122:3–6; Dkt. 87-2 at 96:21–97:16).) Defendants respond that Plaintiff did not report any kidney pain when meeting with Dr. Aguinaldo on June 16, 2016. (Dkt. 110 ¶ 77.) Dr. Aguinaldo provided deposition testimony, in response to an incomplete hypothetical, that if an inmate had reported kidney pain, he would have asked further questions, conducted a physical examination, and ordered lab work, x-rays, blood work, and urine analysis. (Dkt. 87-2 at 96:22–97:5.)

Kidney pain satisfies the "sufficiently serious" prong of the deliberate indifference analysis more easily than, for example, problems with eyeglasses. *Farmer*, 511 U.S. at 834. But Plaintiff has presented no evidence that his malady that day was actually kidney pain, not something else. Plaintiff admits he is not a medical doctor and has not received extensive education in diagnosing conditions. But even when viewing the evidence in a light most favorable to Plaintiff as the nonmoving party, *Scott*, 550 U.S. at 378, Plaintiff has not shown that Dr. Aguinaldo was deliberately indifferent to Plaintiff's alleged kidney pain. Deliberate indifference "requires a showing of more than mere or gross negligence" *Knight*, 590 F.3d at 463,

and there is insufficient evidence that Plaintiff's merely having claimed he had kidney pain amounts to Dr. Aguinaldo realizing that a substantial risk of serious harm existed but then disregarding that risk. *See Perez*, 792 F.3d at 776 (citing *Farmer*, 511 U.S. at 837). Accordingly, the record fails to show that Dr. Aguinaldo acted with deliberate indifference.

* * *

For these reasons, when evaluating Plaintiff's maladies individually and as a whole, Plaintiff has not shown that Dr. Aguinaldo exhibited deliberate indifference towards him such that Plaintiff's Eighth Amendment right to be free from cruel and unusual punishments was violated. Dr. Aguinaldo is thus entitled to summary judgment.

### 2.   Wexford Health Services, Inc.

A "private corporation is not vicariously liable" under Section 1983 "for its employees' deprivations of others' civil rights." *Gayton*, 593 F.3d at 622. In other words, "there is no *respondeat superior* liability" under Section 1983. *Id.* Wexford thus cannot be held liable for the actions of Dr. Aguinaldo, its employee. To hold Wexford liable under a theory of entity liability, Plaintiff could have alleged a *Monell* claim against Wexford. *See Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 378–79 (7th Cir. 2017) (citing *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 98 (1978)). But Plaintiff did not bring a *Monell* claim against Wexford. (Dkt. 70.) As a result, the record's sole reference connecting Plaintiff to Wexford is Plaintiff's allegation that Wexford did not respond to Plaintiff's letter dated August 13, 2016. (Dkt. 102 ¶ 53;

Dkt. 70 at 20–22.) Plaintiff and Defendants all acknowledge that Wexford never responded to this letter. (Dkt. 102 ¶ 53.)

Plaintiff admits that he does not know the address to which he sent the letter, nor does he possess any proof that Wexford ever received it. (*Id.*) Wexford's address does not appear on the letter itself. (Dkt. 70 at 20.) Courts in this District have held that a single letter, without more, is insufficient to establish direct liability for a company providing medical services to inmates, which is "too far removed from day-to-day, individual prisoner medical care to be responsible for the plaintiff's medical care." *Williams v. Carter*, 2012 WL 4815476, at *4 (N.D. Ill. Oct. 10, 2012); *see also Sharif v. Ghosh*, 2013 WL 228239, at *5 (N.D. Ill. Jan. 18, 2013). Indeed, administrators "cannot be expected to involve themselves with the minutiae of daily events in the lives of thousands of prisoners." *Gray,* 714 F. Supp. 2d at 911. Plaintiff's one piece of evidence is insufficient to hold Wexford liable.

Plaintiff has not shown that Wexford exhibited deliberate indifference towards him such that Plaintiff's Eighth Amendment right to be free from cruel and unusual punishments was violated. Wexford is thus entitled to summary judgment.

### 3. Nurse Lawanda Frazier

Plaintiff had a medical appointment with Nurse Frazier on June 28, 2016. (Dkt. 103 ¶ 17.) The parties do not dispute that Plaintiff filled out a "Medical Services Refusal" form thereby refusing to be treated by Nurse Frazier. (Dkt. 103 ¶ 18; Dkt. 85-6.) But the parties disagree as to why Plaintiff completed the refusal form. Plaintiff contends that Nurse Frazier could not find Plaintiff's medical records for the

31

appointment, which Nurse Frazier disputes. (Dkt. 108 ¶ 36.) Nurse Frazier represented to Plaintiff that, without Plaintiff's medical records, Nurse Frazier could not provide a full examination or prescribe medication. (Dkt. 103 ¶ 19.) At most, Nurse Frazier could only check Plaintiff's vitals and provide over-the-counter medication. (*Id.*) If Plaintiff's condition had been an emergency, however, Nurse Frazier would have provided care even without the medical records. (*Id.* ¶ 21.) But Plaintiff maintains that Nurse Frazier encouraged Plaintiff to sign a refusal form so that Plaintiff would not be charged a $5 fee for the appointment. (Dkt. 108 ¶ 38.) Plaintiff thus asserts that he signed the refusal form on Nurse Frazier's "advice." (*Id.* ¶ 40.) Nurse Frazier does not dispute that Plaintiff signed the form; she only disputes Plaintiff's given reason for why Plaintiff signed the form. (*Id.* ¶¶ 36–41.)

Competent persons have a "constitutionally protected liberty interest in refusing unwanted medical treatment." *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 278 (1990). Prisoners retain a "liberty interest in refusing forced medical treatment while incarcerated." *Knight*, 942 F.3d at 342 (citing *Washington v. Harper*, 494 U.S. 210, 221–22 (1990)). Plaintiff exercised his right to refuse treatment from Nurse Frazier by signing the "Medical Services Refusal" form. (Dkt. 103 ¶ 18; Dkt. 85-6.) Nurse Frazier thus respected Plaintiff exercising his right and did not move forward with the appointment. From this perspective, Nurse Frazier behaved appropriately; her actions do not even approach negligence, *Arnett*, 658 F.3d at 751, and most certainly not deliberate indifference. *Perez*, 792 F.3d at 776.

Drawing all inferences in Plaintiff's favor as the nonmoving party, the Court must address Plaintiff's theory as to why he signed the refusal form. Plaintiff maintains that Nurse Frazier could not find Plaintiff's medical records for the appointment. (Dkt. 108 ¶ 36.) Because Nurse Frazier knew that she could not provide a full examination without the records, Nurse Frazier encouraged Plaintiff to sign a refusal form so that he would not be charged a $5 fee for the appointment. (*Id.* ¶ 38.) Plaintiff asserts that he signed the refusal form on Nurse Frazier's "advice." (*Id.* ¶ 40.)

Under this theory, Nurse Frazier appears merely to have attempted to confer a benefit on Plaintiff by saving him the $5 appointment fee. Medical records can be misplaced through no one's fault, and even under Plaintiff's construction, Nurse Frazier offered for Plaintiff to save money by not having a useless $5 appointment. Plaintiff offers no evidence to depart from this characterization of events: more to the point, Plaintiff has cited no evidence that Nurse Frazier's inability to locate Plaintiff's medical records reflected intentional conduct or even reckless disregard. Without more, Plaintiff cannot show a triable issue that Nurse Frazier acted with deliberate indifference. *Perez*, 792 F.3d at 777.

### 4. Nurse Miriam Abraham

The parties dispute whether Plaintiff and Nurse Abraham interacted on August 16, 2016. Plaintiff contends that he gave Nurse Abraham an emergency sick call request that day. (Dkt. 103 ¶¶ 44–45.) Defendants dispute that Plaintiff gave Nurse Abraham this request form because the form is written entirely in Plaintiff's

handwriting and is not marked as received by anyone from Wexford or IDOC. (Dkt. 108 ¶¶ 44–45.)

An examination of the request form itself confirms that no notation from Wexford or IDOC is present. (Dkt. 85-7.) Even when drawing all inferences in Plaintiff's favor as the nonmoving party, Plaintiff has not shown that Nurse Abraham was even negligent towards him, much less deliberately indifferent. *Arnett*, 658 F.3d at 751; *Perez*, 792 F.3d at 777. Without more, Plaintiff cannot show a triable issue that Nurse Abraham deliberately ignored Plaintiff's request or directed others to ignore it. No evidence in the record supports that theory or any other adjacent inference that Plaintiff might want to draw. Accordingly, Nurse Abraham was not deliberately indifferent towards Plaintiff regarding his alleged sick call request form.

There is no dispute that Plaintiff had a medical appointment with Nurse Abraham on October 8, 2016. (Dkt. 103 ¶ 28.) During that appointment, Nurse Abraham recorded a patient history from Plaintiff. (*Id.*) Plaintiff reported that his Hepatitis C and kidney area soreness had persisted. (Dkt. 108 ¶ 47.) Plaintiff also told Nurse Abraham that he had diabetes. (Dkt. 103 ¶ 29.) Nurse Abraham determined that Plaintiff's feet were "not dry" and recommended that he purchase lotion from the commissary to improve the condition of his feet. (*Id.* ¶ 30.) Nurse Abraham also ordered a reevaluation of Plaintiff's diabetes by a doctor to take place the next day. (*Id.* ¶ 32.) As for Nurse Abraham's recommendation that Plaintiff take Tylenol or Motrin to combat his chronic kidney pain, the record is less clear. Plaintiff admits that Nurse Abraham recommended that he take one of these over-the-counter

pain relievers. (*Id.* ¶ 31.) Plaintiff also admits that he refused to take either pain reliever. (*Id.*) Plaintiff contends that he told Nurse Abraham that he was refusing to take the pain relievers because those medications might adversely affect his Hepatitis C condition, which Defendants dispute. (Dkt. 108 ¶ 49.) Nurse Abraham's progress note does not reflect Plaintiff's alleged reason for refusing the pain killers. (Dkt. 85-5.) In any event, the parties do not dispute that Nurse Abraham told Plaintiff that he was refusing treatment, that Plaintiff refused to complete the form, and that Nurse Abraham unilaterally submitted a refusal of service form into Plaintiff's medical records. (Dkt. 108 ¶ 50.) These two topics—that is, Nurse Abraham's interactions with Plaintiff on October 8, 2016—are addressed in turn.

### a.    Undisputed Maladies

Plaintiff admits that Nurse Abraham recommended that he purchase lotion from the commissary to help his feet be less dry. (Dkt. 103 ¶ 30.) Plaintiff also admits that Nurse Abraham ordered a reevaluation of Plaintiff's diabetes by a doctor to take place the next day. (*Id.* ¶ 32.) To address his kidney pain, Plaintiff admits that Nurse Abraham recommended that he take Tylenol or Motrin. (*Id.* ¶ 31.)

Nurse Abraham's treatment decisions were appropriate. She is "entitled to deference in [those] treatment decisions" because Plaintiff has not presented any evidence that "no minimally competent professional would have so responded under those circumstances." *Roe v. Elyea*, 631 F.3d at 857. Plaintiff has not even shown negligence, much less deliberate indifference. *Knight*, 590 F.3d at 463; *Arnett*, 658 F.3d at 751. Accordingly, Nurse Abraham was not deliberately indifferent towards

Plaintiff when she treated him for his complained-of dry feet, ordered reevaluation for diabetes, and recommended pain killers.

### b. Plaintiff Refuses Pain Killers

Plaintiff admits that Nurse Abraham recommended that he take Tylenol or Motrin but that he refused to take either pain killer. (Dkt. 103 ¶ 31.) Plaintiff contends that he told Nurse Abraham that he was refusing to take the pain relievers because those medications might adversely affect his Hepatitis C condition, which Defendants dispute. (Dkt. 108 ¶ 49.) Nurse Abraham's progress note does not reflect Plaintiff's alleged reason for refusing the pain killers. (Dkt. 85-5.) Nurse Abraham told Plaintiff that he was refusing treatment, Plaintiff refused to complete the form, and Nurse Abraham unilaterally submitted a refusal of service form into Plaintiff's medical records. (Dkt. 108 ¶ 50.)

Just as he did during his interaction with Nurse Frazier, Plaintiff exercised his right to refuse medical treatment. *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. at 278 (competent persons have a "constitutionally protected liberty interest in refusing unwanted medical treatment"); *Washington v. Harper*, 494 U.S. at 221–22 (prisoners retain a "liberty interest in refusing forced medical treatment while incarcerated"). Nurse Abraham was correct to insert a refusal of service form into Plaintiff's medical records to reflect Plaintiff's decision. Plaintiff has presented no evidence that such a decision was a "substantial departure from accepted professional judgment, practice, or standards." *Stockton*, 44 F.4th at 616. Plaintiff is not a medical expert, so his conjecture that taking over-the-counter medication might adversely affect his

Hepatitis C carries little weight. Plaintiff has presented no evidence that "no minimally competent professional would have so responded under those circumstances," so Nurse Abraham's decision is entitled to deference. *Elyea*, 631 F.3d at 857. Plaintiff has failed to produce evidence that Nurse Abraham was even negligent, much less deliberately indifferent. *Arnett*, 658 F.3d at 751; *Perez*, 792 F.3d at 777. Accordingly, Plaintiff has not shown that Nurse Abraham exhibited deliberate indifference.

## IV.    CONCLUSION

Defendants' motions for summary judgment (Dkt. 83; Dkt. 86) are granted.

SO ORDERED in No. 17-cv-05609.

Date: March 30, 2024

_____

JOHN F. KNESS
United States District Judge